IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

UNITED STATES OF AMERICA,       )
                                )
            Plaintiff,          )
                                )
      v.                        )      Criminal Action No.
                                )      08-00022-03-CR-W-SOW
JULIAN MORALES FLORES,          )
                                )
            Defendant.          )

**REPORT AND RECOMMENDATION TO DENY
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE AND STATEMENTS**

Before the court is defendant's motion to suppress his statement and evidence seized from his residence on the grounds that his arrest was illegal, he did not knowingly waive his <u>Miranda</u> rights, he did not knowingly consent to a search of his residence, and the police exceeded the scope of the consent by seizing personal property unrelated to any criminal activity or investigation. I find that defendant voluntarily consented to a search of his residence, the search was within the scope of his consent, he voluntarily waived his <u>Miranda</u> rights and made a voluntary statement, and there was no probable cause for his arrest but that the taint of the unlawful arrest was sufficiently purged and neither the evidence seized as a result of the voluntary consent nor defendant's voluntary statement should be suppressed as fruits of the unlawful arrest. Therefore, defendant's motion to suppress evidence and his statement should be denied.

## I.   BACKGROUND

On January 16, 2008, a criminal complaint was filed charging defendant and two co-defendants with one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).  According to the complaint, the Detroit FBI office was investigating a Mexican organization which was shipping marijuana to the United States inside of generators.  Authorities in Kansas City were notified that Consolidated Transfer & Warehouse ("Consolidated") located in North Kansas City, Missouri, was a receiving point for drugs shipped from El Paso, Texas.

On January 14, 2008, Consolidated received a large crate at their shipping facility with an originating shipping point of El Paso.  The name on the bill of lading was the same as that of previous bills of lading and indicated that the item in the crate was a generator.  A drug-trained dog alerted positively to the presence of illegal drugs inside the crate.  A state search warrant was obtained and 1,531 pounds of marijuana were found inside the generator.

Two Hispanic males arrived driving a Penske rental panel truck and picked up the generator.  They drove to a location in Independence, Missouri, where defendant was observed outside walking toward the rear of the truck carrying a drill.  Defendant admitted that he was to be paid $1,000 to help unload the

2

contents the of crate which he assumed to be either drugs or stolen property.

On February 6, 2008, an indictment was returned charging defendant and his two co-defendants with one count of conspiracy to possess with intent to distribute marijuana, in violation of 21 U.S.C. § 846, and one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B).

On February 26, 2008, defendant filed a motion to suppress statements, stating that "due to time constraints imposed by the Court, defendant felt compelled to file his motion now", before having reviewed any discovery (document number 46). Defendant stated that his motion was based on "information and belief" rather than on any facts gleaned from reviewing the discovery. I entered an order directing defendant to file a supplemental motion to suppress after having reviewed the discovery, and pointing out that pretrial motions were not due for another 13 days.

On March 10, 2008, defendant filed an amended motion to suppress on the above-stated grounds (document number 58). On March 19, 2008, the government filed a response stating that defendant spoke English during the entire incident and that defendant has alleged no facts that call into question the legality of the statement or the arrest (document number 62).

On March 25, 2008, I held an evidentiary hearing on defendant's motion to suppress. The government appeared by Assistant United States Attorney Bruce Rhoades. The defendant was present, represented by Henri Watson. The following witnesses testified:

1. Special Agent Brian Ford, Federal Bureau of Investigation

2. Detective Gary Gibson, Kansas City, Missouri, Police Department

3. Detective James Svoboda, Kansas City, Missouri, Police Department

In addition, the following exhibits were marked and admitted into evidence:

P. Ex. 1  Consent to search form signed by defendant

P. Ex. 2  List of items seized from 10101 East 18th Street, Independence, Missouri; defendant's Suburban, and the Penske box truck

P. Ex. 3  Waiver of <u>Miranda</u> rights form, signed by defendant (misdated January 15, 2007, should have been January 15, 2008)

P. Ex. 4  Detective Investigation Report

P. Ex. 5  Consent to search cell phone, signed by defendant

P. Ex. 6  Investigative Report re: interview with defendant

## II.  EVIDENCE

On the basis of the evidence presented at the suppression hearing, I submit the following findings of fact:

1.  In late 2007, Special Agent Brian Ford of the FBI received information from the FBI in Detroit that they had

4

interdicted a load of marijuana shipped through a common carrier
(Tr. at 7).  Through their investigation, they provided
information that a load of marijuana would be shipped into the
Kansas City area (Tr. at 7).  They identified the receiving
company as Consolidated Transfer Warehouse ("Consolidated") (Tr.
at 7).

2.    Special Agent Ford went to Consolidated and learned
that they were expecting a crate similar in nature to what
Detroit had interdicted (Tr. at 7).  When the crate came in on
January 14, 2008, Consolidated's management notified the FBI (Tr.
at 7).  A certified drug canine was dispatched to the warehouse
and alerted positively to the crate, indicating there were drugs
inside (Tr. at 7).  The dog's response was listed in an affidavit
for a search warrant which was issued that same day (Tr. at 7,
67).

3.    The FBI executed the search warrant on January 14,
2008, and found approximately 1,531 pounds of packaged marijuana
inside the crate (Tr. at 7).  The crate had been secured with
screws (Tr. at 94).  Members of the Kansas City Metropolitan Gang
Task Force removed about 1,528 pounds of the marijuana, leaving
about three pounds in the crate (Tr. at 8, 67).  The next
morning, on January 15, 2008, two individuals showed up at
Consolidated to pick up the crate (Tr. at 8, 67).  Law
enforcement observed that the two men had arrived in a Penske-

type box truck (Tr. at 8, 67). The crate was loaded into the truck, and the men drove the truck away (Tr. at 8, 67). Law enforcement watched the truck for about an hour until it was seen arriving at a residence at 10101 East 18th Street in Independence, Missouri, which is defendant's residence (Tr. at 8, 10, 12, 22, 67). Normally it would take about 25 to 30 minutes to make the trip from the warehouse to the residence; however, the driver took a lot of back roads and made one stop at a convenience store (Tr. at 9). Law enforcement observed that the two men in the truck often looked behind them and looked at other vehicles around them (Tr. at 9-10).

4.  Law enforcement officers observed the truck arrive at the residence and back up to a garage (Tr. at 10, 53, 54). The garage was not attached to the house; it was located in the rear corner of the property (about 20 feet from the road and 20 to 30 feet from the house), and the garage door was open (Tr. at 10, 69, 70, 71, 73). Defendant was seen outside near the truck (Tr. at 72). Defendant and two other individuals walked up to the truck as it backed toward the garage (Tr. at 10-11, 69, 93). When the truck stopped, the two men inside got out and walked toward the back of the truck (Tr. at 71-72, 92). One of the men opened the back of the truck, and several of the men got into the truck (Tr. at 72). After the truck door had been opened, defendant went into the house and came back out again carrying a

6

screwdriver/electric hand drill (Tr. at 69, 93, 94). Defendant headed toward the back of the truck; and at that time, Sgt. Renee Reyes decided to make an arrest (Tr. at 11, 22-23, 67, 73). The two men who had been in the truck were Elias Lozano and Cesar Alire-Lozano, co-defendants in this case[1] (Tr. at 11-12, 22, 68). Those two men along with defendant and the other two men from the residence were all placed under arrest (Tr. at 11-12, 68).

5.    Detective Gibson was wearing plain clothes with a jacket that said police on the back, the front, and the sleeves (Tr. at 45). He asked defendant if he lived at the house, and defendant said, "yes" (Tr. at 43). Detective Gibson asked defendant if he spoke English, and defendant said, "yes" (Tr. at 43, 55). Detective Gibson asked defendant if he knew English well enough to understand what Detective Gibson was saying, and defendant said, "yes, I can" (Tr. at 43). Detective Gibson does not know any Spanish (Tr. at 43). Defendant spoke "perfect English" according to Detective Gibson (Tr. at 43, 44, 52). Detective Gibson realizes how important it is to make sure a suspect of Latino descent understands English before he talks to him about consent (Tr. at 46, 52).

---

[1]Police subsequently learned that Elias Lozano and Cesar Alire-Lozano are from Texas; they flew to Kansas City, rented the truck, and relied on assistance to get from the warehouse to the residence since they were not familiar with the city (Tr. at 22).

6.     Detective Gibson advised defendant of his <u>Miranda</u>
rights (Tr. at 49, 50).  Defendant said he fully understood his
rights (Tr. at 49-50, 59).

7.     Detective Gibson asked defendant if he owned the
residence, and defendant said, "I own the residence." (Tr. at 43-
44).  Detective Gibson said he would like to get defendant's
consent to search the residence, and defendant said, "You can go
into my house because I have nothing to hide." (Tr. at 44).
Detective Gibson told defendant that the police were
investigating a drug crime, that the house was involved in that
drug crime, and that he would be going into defendant's house and
looking for evidence of that drug crime in defendant's house (Tr.
at 44, 56).  Detective Gibson said that if defendant did not
consent, Detective Gibson could not go into defendant's house at
this time (Tr. at 46, 56).  He told defendant many times that
defendant did not have to consent to the search (Tr. at 48-49,
56).  Defendant said Detective Gibson could go in the house
because defendant had nothing to hide, that he had nothing
illegal in his house (Tr. at 44, 49).  Defendant was under arrest
and in handcuffs when this conversation occurred (Tr. at 44-45).

8.     Detective Gibson read the consent-to-search form to
defendant and asked him if he had any questions (Tr. at 46-47,
58). Defendant then read the form back to Detective Gibson out
loud and in English (Tr. at 47, 58-59).  Defendant then signed

8

the consent-to-search form (Tr. at 49-50). Defendant consented
to the seizure of anything pertinent to the investigation or any
criminal matter (Tr. at 14; P. Ex. 1). Police were looking for
evidence of movement of cash; solicitation of drug trafficking;
identification of individuals, associates, income, and travel
history (Tr. at 15). Defendant signed the consent-to-search form
about 12 minutes after he was arrested (Tr. at 56).

9.    Renee Reyes videotaped the inside of the residence and
the perimeter before the search (Tr. at 31, 57). The purpose of
this is to record the condition of the premises before and after
the search in case officers are accused of damaging the house
(Tr. at 36).

10.    Police seized a 45 caliber magazine containing six live
rounds, as well as utility bills and phone bills because they
show who is responsible for the residence and are used for
identification (Tr. at 24-25; P. Ex. 1). Police seized some 3x5
photographs, and a few that were larger (Tr. at 25). The
photographs were not in frames (Tr. at 26). Two photographs were
found inside defendant's Suburban, and the others were found in
the residence (Tr. at 26). Photographs were seized because they
show individuals, known and unknown to the police, who associate
with the defendant (Tr. at 26). Between the date of seizure and
the date of the hearing, police had not been able to tie any of
the other individuals in the pictures to criminal activity (Tr.

at 27). At no time during the search did defendant indicate that he wanted the search to stop (Tr. at 51).

11. In addition to searching the residence, law enforcement officers searched the Penske truck and a 2004 Chevrolet Suburban owned by defendant (Tr. at 13).

12. Both the Kansas City, Missouri, Police Department and the FBI have policies that require inventories to be done at the time of towing (Tr. at 13).

13. After defendant was transported to police headquarters, he was processed and booked (Tr. at 76). No one questioned him during that time (Tr. at 76). Defendant was then was placed in an interrogation room with Detective Svoboda and Special Agent Brian Cyprian (Tr. at 75, 77). Detective Svoboda asked defendant identifying questions from a Detective Investigation Form -- questions such as residence, education, and relatives' names (Tr. at 77; P. Ex. 5). Defendant was conversing with Detective Svoboda in English while these questions were being asked (Tr. at 79). Detective Svoboda had no difficulty communicating with defendant in English (Tr. at 79). Defendant gave no indication that he was having any difficulty conversing in English (Tr. at 79).

14. Detective Svoboda then advised defendant why they were talking to him and why he was under arrest (Tr. at 79-80, 110). Detective Svoboda was not aware that defendant had previously

been advised of his Miranda rights while at his residence (Tr. at 73-74). Detective Svoboda advised defendant of his Miranda rights, asked defendant if he understood all his rights, and asked defendant to read aloud the Miranda rights from the waiver form and ask any questions he may have (Tr. at 80, 82, 83). Defendant read the Miranda rights in English (Tr. at 83). When Detective Svoboda asked defendant if he was willing to talk to the police in light of his rights, defendant said that he understood his rights and he was willing to talk (Tr. at 83, 123). At 4:09 p.m., defendant signed the Miranda waiver form (Tr. at 76; P. Ex. 3).

Detective Svoboda then asked defendant for consent to search his cell phone (Tr. at 87). The cell phone had been found on defendant's person when he was arrested (Tr. at 121). Detective Svoboda told defendant he had a right to refuse consent to search the phone and that absent his consent, the police would need to apply for a search warrant (Tr. at 87-88). Detective Svoboda prepared a consent-to-search form listing defendant's cell phone as the item to be searched (Tr. at 85; P. Ex. 5). Defendant read the consent form in the presence of Detective Svoboda (Tr. at 88). Defendant said there was nothing in his cell phone, and that they could look in his cell phone if they wanted to (Tr. at 88). Defendant signed the consent form at 4:14 p.m. (Tr. at 87; P. Ex. 5).

15.  Detective Svoboda then interviewed defendant with Agent Cyprian in the room (Tr. at 89).  They were both in casual clothes and neither was armed (Tr. at 89).  No one made any threats or promises to get defendant to talk (Tr. at 89).  Defendant was described as cooperative (Tr. at 95).  Detective Svoboda prepared an investigative report of his interview with defendant (Tr. at 85).  Defendant had said he did not know what was in the crate, but that he thought it was something illegal (Tr. at 101-102, 113).  When asked what he thought it was, he said he thought it was stolen property or drugs (Tr. at 114).

16.  Detective Svoboda told defendant if he was honest, the prosecutor would be informed that defendant had been cooperative (Tr. at 118).  Detective Svoboda did inform the Assistant United States Attorney that defendant had been cooperative (Tr. at 118).

### III.  *WAIVER OF <u>MIRANDA</u>*

Defendant argues that he did not knowingly waive his <u>Miranda</u> rights.

The government bears the burden of providing by a preponderance of the evidence that the defendant made a knowing and voluntary waiver of his <u>Miranda</u> rights.  <u>Colorado v. Connelly</u>, 479 U.S. 157, 158 (1986); <u>United States v. Dougherty</u>, 810 F.2d 763, 772 (8th Cir. 1987).  There is no requirement that, to be voluntary, the waiver be the product of a free will. <u>Connelly</u>, 479 U.S. at 170.  The sole concern of the Fifth

12

Amendment, upon which Miranda was based, is governmental coercion. Id.; United States v. Washington, 431 U.S. 181, 187 (1977). The voluntariness of a waiver of this privilege depends on the absence of police overreaching, i.e., the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Connelly, 479 U.S. at 170; Moran v. Burbine, 475 U.S. 412, 420 (1986); Fare v. C., 442 U.S. 707, 726-27 (1979).

An explicit statement of waiver is not invariably necessary to support a finding that the defendant waived his Miranda rights. North Carolina v. Butler, 441 U.S. 369 (1979). An express written or oral statement of waiver of Miranda rights is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver. Id. at 373.

> The question is not one of form, but rather whether the
> defendant in fact knowingly and voluntarily waived his
> rights delineated in the Miranda case. As was unequivocally
> said in Miranda, mere silence is not enough. That doesn't
> mean that the defendant's silence, coupled with an
> understanding of his rights and course of conduct indicating
> waiver, may never support a conclusion that a defendant has
> waived his rights. . . . [I]n at least some cases waiver
> can be clearly inferred from the actions and words of the
> person interrogated.

Id. at 373.

Whether a defendant waived his Miranda rights is a question of fact for the trial judge and must be determined on the

Case 4:08-cr-00022-ODS   Document 75   Filed 04/17/08   Page 13 of 34

particular facts and circumstances surrounding the case, including the background, experience, and conduct of the accused. Id. at 374; United States v. Dougherty, 810 F.2d 763, 772 (8th Cir. 1987); Stumes v. Solem, 752 F.2d 317, 319 (8th Cir. 1985). The totality of the circumstances test applies. Dougherty, 810 F.2d at 773.

In this case I find that defendant knowingly and voluntarily waived his Miranda rights. There is no question that defendant was advised of his Miranda rights while still at his residence. He stated then that he understood his rights. A couple of hours later, he was again advised of his Miranda rights. He said he understood and that he was willing to waive those rights and talk to Detective Svoboda. Defendant spoke in English and had no difficulty understanding or conversing with the detectives at his residence. He spoke in English while at the police station and had no difficulty answering the general booking type questions prior to being advised a second time of his Miranda rights. Defendant was described as cooperative. There is no evidence of any police intimidation, coercion, or deception.

Based on the totality of the circumstances, I find that defendant knowingly and voluntarily waived his Miranda rights and his statement was voluntary. Therefore, his motion to suppress on this basis should be denied.

14

## IV.  CONSENT TO SEARCH

Defendant argues that he did not knowingly consent to a
search of his residence.

Even when police officers have neither probable cause nor a
warrant, they may search an area if they obtain a voluntary
consent from someone possessing adequate authority over the area.
United States v. Matlock, 415 U.S. 164, 171 & n. 7 (1974);
Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973).  Voluntary
consent need not amount to a waiver.  United States v. Chaidez,
906 F.2d 377, 380 (8th Cir. 1990).  Consent can be voluntary
without being an "intentional relinquishment or abandonment of a
known right or privilege."  Bustamonte, 412 U.S. at 235.  The
proper test is whether the totality of the circumstances
demonstrates that the consent was voluntary.  Id. at 226.

The government bears the burden of proving a voluntary
consent to search by a preponderance of the evidence.  Bumper v.
North carolina, 391 U.S. 543, 548 (1968); United States v. Ramey,
711 F.2d 104, 107 (8th Cir. 1983).  The question of whether the
consent was voluntarily given is a question of fact for the trial
court.  United States v. Cortez, 935 F.2d 135, 142 (8th Cir.
1991); United States v. Alberts, 721 F.2d 636 (8th Cir. 1983).
Consent is voluntary if it was "the product of an essentially
free and unconstrained choice by its maker" rather than the
product of duress or coercion, express or implied.  Bustamonte,

15

412 U.S. at 225, 227.  This determination depends upon the totality of the circumstances in a particular case.  Id. at 226.

Here the credible evidence is that defendant had no difficulty conversing in English.  When Detective Gibson said he would like to get defendant's consent to search the residence, defendant readily stated that the police could search the house because he had nothing to hide.  Detective Gibson explained to defendant that the police were investigating a drug crime and that he would be going into defendant's house looking for evidence of a drug crime.  He told defendant that if defendant did not consent, the police could not go into defendant's house at that time.  He told defendant several times that he did not have to consent to the search.  Defendant repeatedly said that the police could go into the house and search because defendant had nothing illegal in the house and had nothing to hide.

Detective Gibson read a consent-to-search form to defendant and asked if he had any questions.  Defendant read the form back to Detective Gibson out loud, he had no questions, and he signed the consent form.

There is absolutely no evidence that defendant's consent was the product of duress or coercion, express or implied.  Indeed, it is not even clear on what grounds defendant believes his consent was not voluntary, as his amended motion alleges only the following:

16

Defendant Morales did not knowingly and intelligently consent to the search of his home without a search warrant, and even if the Court finds that he did, law enforcement officers exceed the scope of their consent by seizing personal property unrelated to any criminal activity or investigation which defendant requests this Court to order be returned to him.

Based on the totality of the circumstances, I find the defendant knowingly and voluntarily consented to the search of his residence. Therefore, defendant's motion to suppress on this basis should be denied.

## V. *SCOPE OF THE CONSENT*

Defendant argues that the police exceeded the scope of the consent by taking photographs and other paperwork (see above-quoted paragraph). This argument is without merit. The uncontroverted evidence establishes that defendant agreed to allow the officers to search his residence for "any person, property, item, or substance determined by the Kansas City, Missouri Police Department to be relevant either to the matter under investigation or any criminal matter." The uncontroverted evidence also establishes that police seized utility bills and phone bills to show who is responsible for the residence, and they seized photographs because the photographs were evidence of associations. There is no evidence that the police searched any place that was not included in the consent.

17

Because there is no evidence that the search exceeded the scope of the consent, defendant's motion to suppress on this basis should be denied.

## VI. LEGALITY OF THE ARREST

It is undisputed that the police had no arrest warrant at the time defendant was taken into custody.  However, law enforcement officials have probable cause to effectuate a warrantless arrest of a suspect in a public place if a reasonably prudent person would have believed, based on the facts known to the arresting officer, that the suspect committed a criminal offense.  <u>Brinegar v. United States</u>, 338 U.S. 160, 175-176 (1949).

This issue is problematic in this case.  Surprisingly, the sum total of the briefing on this issue is the following:

> In the alternative, any statement made by the defendant was the product of an illegal arrest and the same should be excluded from the trial of this case.

Def. Amended Motion at p. 3.

> Morales-Flores has alleged no facts or circumstances that call into question the basis for the defendant's arrest.  The facts herein clearly establish probable cause for the arrest of the defendant.  [footnote - It should be noted that the court made a probable cause determination on this case when it was filed as a complaint on January 16, 2008.]

Gov. Response[2] at page 16.

---

[2]This response is surprising to me, since it is the government's burden to establish probable cause to arrest when there is no arrest warrant.  <u>See</u> <u>United States v. Costello</u>, 604

Neither party has elaborated on any theory of suppression or admission, and neither party has provided any legal authority for its position. Although defendant requests only that his statements be suppressed as a result of an illegal arrest, I will deal with both the statements and the evidence seized as a result of defendant's consent to search his house.

Probable cause for an arrest exists when the totality of circumstances demonstrates that the arresting officer personally knows or has been reliably informed of sufficient facts to warrant a belief that a crime has been committed and that the person to be arrested committed it. United States v. Reinholz, 245 F.3d 765, 778 (8th Cir. 2001). In this case there is no doubt that the police had probable cause to believe that a crime had been committed -- they had over 1,500 pounds of marijuana that had been seized from the generator pursuant to a search warrant. The question is whether police had sufficient facts to

_____

F.2d 589, 591 (8th Cir. 1979). See also United States v. Laville, 480 F.3d 187, 200-01 (3rd Cir. 2007); United States v. Valenzuela, 365 F.3d 892, 902 (10th Cir. 2004). Additionally, when a judge is presented with a criminal complaint, the issue is whether there is probable cause to believe a crime has been committed by this person based on the information contained in the affidavit. The affidavit in this case included defendant's admission that he was being paid to receive what he believed to be stolen property or illegal drugs. It is not my function when evaluating an affidavit in support of a criminal complaint to attempt to weed out any evidence that may later be deemed inadmissible. The issue of probable cause to arrest includes only the information known by the police at the moment the defendant is arrested; therefore, it cannot include defendant's subsequent confession.

warrant a belief that the defendant was the person who committed that crime.

When the police know that a package contains illegal drugs, there is not much more that is required to establish probable cause. For example, in United States v. Williams, 902 F.2d 678 (8th Cir. 1990), UPS intercepted a package containing cocaine. Crushed aspirin was substituted for the cocaine, and the bag of aspirin was coated with an invisible fluorescent powder which could be detected only under an ultraviolet light. An officer posing as a deliveryman delivered the package, and shortly thereafter police entered the residence pursuant to a search warrant. Police observed that the package had been opened, and Williams's hands showed traces of the fluorescent powder under ultraviolet light. The court held that these facts provided probable cause to believe that Williams was involved in a drug crime.

In United States v. Barrios, 210 F.3d 355, 2000 WL 419940 (2nd Cir. (N.Y.) April 18, 2000) (Table), officers intercepted a package containing cocaine. They substituted a sham substance for the cocaine, inserted an alarm that would alert the officers when the package was being moved, and made a controlled delivery. After the delivery, the alarm inside the package indicated that the package was on the move. At the same time, Barrios emerged

from the building carrying a bag, and officers could see the outline of the intercepted package in Barrios's bag. The court held that those observations by police were sufficient to establish probable cause that Barrios was involved in a drug crime.

In <u>United States v. Armstrong</u>, 2003 WL 21267479 *2 (3rd Cir. (Pa.) May 29, 2003), postal inspectors intercepted a package containing two kilograms of cocaine. The defendant arrived at the residence just minutes after the package had been delivered. When police entered the residence, they found Armstrong standing near the opened package. The court found that these facts established probable cause that Armstrong was at the residence to obtain illegal drugs.

In <u>United States v. Montana</u>, 958 F.2d 516, 519 (2nd Cir. 1992), DEA agents obtained information that Gomez would attempt to pick up a package of cocaine on a certain day. Montana accompanied Gomez to the site of the controlled delivery, conversed with him, paced back and forth, and attempted to peer through the darkened windows of a DEA surveillance car. The court held that these facts established probable cause that Montana was a knowing participant in the drug pickup.

Outside the "controlled delivery" factual situation, courts have consistently held that there must be some fact tying the

Case 4:08-cr-00022-ODS   Document 75   Filed 04/17/08   Page 21 of 34

illegal activity to the suspect before probable cause arises. For example, in United States v. Reinholz, 245 F.3d 765, 778-79 (8th Cir. 2001), police were informed that Reinholz legally purchased iodine crystals, which are used in the manufacture of methamphetamine. Police conducted a trash pull and found drug paraphernalia and documents identifying Reinholz and another person named Chevalier. The Eighth Circuit held that the police did not have probable cause to arrest Reinholz because "the information in their possession at the time of the arrest did not sufficiently warrant a belief that Reinholz committed a crime." Id.

I have been unable to find any case which held that probable cause to arrest exists under the circumstances of this case. The defendant was present at his residence when the delivery truck arrived. He went into his house and came outside with a drill. Had the police waited until defendant opened the crate and then opened the generator, clearly probable cause to arrest him would have existed. However, here, they jumped the gun and placed defendant under arrest before observing any activity on his part that would lead them to believe that he knew there was something illegal inside the generator that was inside the crate that was inside the truck.

Defendant states in his motion that his statements must be suppressed as a result of his illegal arrest. In order for a

statement given to police after an unlawful arrest to be admissible, the statement must not only be voluntary under Fifth Amendment standards but must not be the result of an unconstitutional seizure. United States v. Reinholz, 245 F.3d 765, 779 (8th Cir. 2001). The courts must evaluate four factors to determine whether statements made to the police after an illegal arrest are admissible: (1) whether the suspect has been advised of his Miranda rights prior to giving his statement, (2) the temporal proximity of his statement to his illegal seizure, (3) the existence of intervening causes between the illegal arrest and the statement, and (4) the purpose or flagrancy of the official misconduct. Brown v. Illinois, 422 U.S. 590, 603-604 (1975); United States v. Reinholz, 245 F.3d at 779. The burden of showing admissibility of in-custody statements of a suspect who has been illegally arrested rests with the government. Brown v. Illinois, 422 U.S. at 604.

In Section III. above, I found that defendant voluntarily waived his Miranda rights and that his statement was voluntary. However, even if a statement is found to be voluntary under the Fifth Amendment, the Fourth Amendment issue remains. Brown v. Illinois, 422 U.S. at 601-602. "In order for the causal chain, between the illegal arrest and the statements made subsequent

23

thereto, to be broken, <u>Wong Sun</u>[3] requires not merely that the statement meet the Fifth Amendment standard of voluntariness but that it be 'sufficiently an act of free will to purge the primary taint.'" <u>Id</u>. at 602. The question of whether a confession is the product of a free will under <u>Wong Sun</u> must be answered on the facts of each case. <u>Id</u>. at 603. No single factor is dispositive. <u>Id</u>. However, the flagrancy of the official misconduct is considered the most important factor because it is directly tied to the purpose of the exclusionary rule -- deterring police misconduct. <u>United States v. Herrera-Gonzalez</u>, 474 F.3d 1105, 1111 (8th Cir. 2007); <u>United States v. Simpson</u>, 439 F.3d 490, 496 (8th Cir. 2006). Application of the exclusionary rule "does not serve this deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." <u>Id</u>.

**A.   *MIRANDA* RIGHTS**

The first factor is whether defendant was advised of his <u>Miranda</u> rights prior to giving his statement. The undisputed evidence is that he was advised of his <u>Miranda</u> rights on two occasions before he made the statement.

---

[3]<u>Wong Sun v. United States</u>, 371 U.S. 471 (1963), held that not only evidence obtained in violation of the Fourth Amendment, but also evidence "come at by exploitation of the illegality," must be suppressed.

24

## B.   TEMPORAL PROXIMITY

The second factor is the temporal proximity of his consent to search or his statement, to his illegal arrest.

The undisputed evidence is that defendant was arrested, was advised of his <u>Miranda</u> rights, and then signed a consent-to-search form about 12 minutes after he was arrested.  The consent-to-search form was signed at 10:32 a.m., which means that defendant was arrested at approximately 10:20 a.m.  Defendant signed a <u>Miranda</u> waiver form at 4:09 p.m. and subsequently gave the statement at issue here.  Therefore, about five hours and 50 minutes elapsed between the time of defendant's unlawful arrest and the commencement of his interview.

The Eighth Circuit has held that as little as ten minutes can be sufficient to purge the taint of an illegal stop.  <u>United States v. Herrera-Gonzales</u>, 474 F.3d at 1112 (ten minutes); <u>United States v. Esquivel</u>, 507 F.3d 1154, 1160 (8th Cir. 2007) (nine minutes and 35 second); <u>United States v. Palacios-Suarez</u>, 149 F.3d 770, 772-73 (8th Cir. 1998) (nine minutes); <u>United States v. Ramos</u>, 42 F.3d 1160, 1164 (8th Cir. 1994) ("close in time").

## C.   INTERVENING CAUSES

The third factor is the existence of intervening causes between the illegal arrest and the statement.  The possible

Case 4:08-cr-00022-ODS   Document 75   Filed 04/17/08   Page 25 of 34

intervening causes are many and varied:  A co-defendant's statement implicating the defendant, <u>Miranda v. Leibach</u>, 394 F.3d 984, 988 (7th Cir. 2005), <u>cert</u>. <u>denied</u>, 523 U.S. 1010 (1998); discovery of contraband or voluntary consent to search, <u>United States v. Esquivel</u>, 507 F.3d 1154, 1160 (8th Cir. 2007); inability to verify license plates or driver's license, <u>United States v. Herrera-Gonzales</u>, 474 F.3d 1105, 1112 (8th Cir. 2007).

In <u>United States v. Delancy</u>, 502 F.3d 1927, 1311 (11th Cir. 2007), the court held that the signing of a consent form is an "important" intervening event:

> The facts of this case suggest an important intervening circumstance:  Godfrey's review and signing of the consent form, which served as a notification to Godfrey of her constitutional rights.  The written form unambiguously informed Godfrey that she had a right to refuse to give consent, that she could demand that a warrant be obtained prior to any search, that she could consult with an attorney before consenting, that any contraband or evidence seized could be used against her in a court of law, and, finally, that she could withdraw her consent at any time.  Agent Leahy testified that Detective Mercado went over the form with Godfrey carefully, and the district court found that Godfrey understood what it meant.  Under the facts of this case, this thorough notification of constitutional rights constitutes an important intervening circumstance.

In this case, the undisputed evidence establishes that after the unlawful arrest, defendant was informed of his <u>Miranda</u> rights and said he understood.  He said he owned the residence and said the police could go in because he had nothing to hide.  Detective Gibson told defendant that the police were investigating a drug

crime and that he would be going into defendant's house to look for evidence of a drug crime.  He told defendant that if he did not consent, the police could not go into his house.  He told defendant many times he did not have to consent to the search. Defendant said the police could go into the house and search. Defendant then signed a consent-to-search form after it was read to him and he read it back to the detective.  The consent form states that defendant understands that he has a constitutional right to refuse permission to search and that anything found may be used against him.

These facts are nearly identical to the facts of <u>Delancy</u>, supra.  I find that defendant's voluntary consent to search was an important intervening circumstance between the illegal arrest and both the consent to search and the defendant's statement[4].

**D.    *PURPOSE OR FLAGRANCY OF OFFICIAL MISCONDUCT***

The final factor is the purpose or flagrancy of the official misconduct.  The flagrancy of the official misconduct is considered the most important factor because it is directly tied to the purpose of the exclusionary rule -- deterring police misconduct.  <u>United States v. Herrera-Gonzalez</u>, 474 F.3d 1105,

---

[4]The Eighth Circuit has found that even absent any intervening circumstances, where the conduct of the officer was in good faith, the evidence obtained subsequent to an unlawful arrest should not be suppressed.  <u>United States v. Ramos</u>, 42 F.3d 1160, 1164 (8th Cir. 1994), <u>cert</u>. <u>denied</u>, 514 U.S. 1134 (1995).

1111 (8th Cir. 2007); <u>United States v. Simpson</u>, 439 F.3d 490, 496 (8th Cir. 2006). Application of the exclusionary rule "does not serve this deterrent function when the police action, although erroneous, was not undertaken in an effort to benefit the police at the expense of the suspect's protected rights." <u>Id</u>.

Courts have found purposeful and flagrant conduct where: (1) the impropriety of the official's misconduct was obvious or the official knew, at the time, that his conduct was likely unconstitutional but engaged in it nevertheless; and (2) the misconduct was investigatory in design and purpose and executed in the hope that something might turn up. <u>Brown v. Illinois</u>, 422 U.S. 590, 605 (1975); <u>United States v. Herrera-Gonzales</u>, 474 F.3d 1105, 1113 (8th Cir. 2007); <u>United States v. Simpson</u>, 439 F.3d 490, 496 (8th Cir. 2006).

In <u>United States v. Simpson</u>, 439 F.3d 490 (8th Cir. 2006), two officers arrested Simpson, one believing him to be a different person with an outstanding arrest warrant, and the other knowing he was not the person with the warrant but suspicious because he ran when he saw the police. The court found that even though the arrest was not supported by probable cause, there was no evidence that either officer acted with the knowledge that his conduct was likely unconstitutional, illegal, or improper. <u>Id</u>. at 496.

In <u>United States v. Palacios-Suarez</u>, 149 F.3d 770 (8th Cir. 1998), an officer stopped a car because its tinted windows violated a Nebraska law. The Nebraska law, however, applied only to cars that were registered in Nebraska, which this car was not.

> [The officer] asked Mr. Palacios four separate times if he and Officer Lippold could search the vehicle and three times stopped to make sure that Mr. Palacios understood what he was asking of him. Sgt. Thompson, of course, was under no obligation to inform Mr. Palacios that he did not have to consent to a search, and Sgt. Thompson did not do so. But he did go beyond what was required in another respect, by explaining to Mr. Palacios that he would be searching for narcotics and for weapons.

Under these circumstances, the court held that the evidence seized during the consensual search was purged of the taint of the unlawful stop.

In <u>United States v. Kreisel</u>, 210 F.3d 868 (8th Cir. 2000), officers stopped a Ryder rental truck because they had reason to believe that the truck was a commercial vehicle near a motorcycle rally which required a permit or license. The court found that because the truck was driving away from the rally instead of toward it, the officers did not have probable cause to stop the truck. However, the court held that the evidence found in the truck during a consensual search should not be suppressed:

> We detect nothing in the record that would support a conclusion that the police purposefully engaged in misconduct (if, indeed, there was any misconduct), and since the unlawfulness was certainly not flagrant (if, indeed, there was any unlawfulness), we also conclude that there is no evidence that police in this case stopped the truck as part of a preconceived plan to extract a consent to search it from the driver.

29

<u>Id</u>. at 870.

In contrast to the above cases, the cases wherein the courts have held that evidence obtained following an unlawful arrest should be suppressed involve much different police conduct. For example, in <u>Brown v. Illinois</u>, 422 U.S. 590 (1975), police suspected Brown (among others) of having been involved in a recent murder. Two officers broke into Brown's apartment and searched it, then waited for him to return at which time they arrested him at gunpoint. He was taken to the police station where he eventually made a statement. The Supreme Court stated:

> The illegality here, moreover, had a quality of purposefulness. The impropriety of the arrest was obvious; awareness of that fact was virtually conceded by the two detectives when they repeatedly acknowledged, in their testimony, that the purpose of their action as "for investigation" or for "questioning." The arrest, both in design and in execution, was investigatory. The detectives embarked upon this expedition for evidence in the hope that something might turn up. The manner in which Brown's arrest was affected gives the appearance of having been calculated to cause surprise, fright, and confusion.

<u>Id.</u> at 605.

In <u>United States v. Reinholz</u>, 245 F.3d 765 (8th Cir. 2001), the defendant was arrested at his place of employment, he was handcuffed and driven in a police car for 25 minutes without having been advised of his <u>Miranda</u> rights, and was taken to a school a couple of blocks from his residence where police told him his residence was going to be searched. Reinholz then stated that police would probably find drug paraphernalia in the house.

30

At that time he was advised of his <u>Miranda</u> rights and consented to a search of his car where evidence was seized.

In ordering the statement and evidence suppressed, the court stated, "The officers were not forthcoming and they did not advise Reinholz of his <u>Miranda</u> rights until after they reached the junior high school parking lot. . . . Reinholz refused to sign a consent form".

In <u>United States v. Peters</u>, 10 F.3d 1517 (10th Cir. 1993), a police officer stopped a rental truck after it briefly crossed the center line. He determined that the driver and passenger had proper identification. They indicated they were brothers moving from California to Dallas. The officer obtained their consent to search the truck, and the officer found boxes of clothing and household items. After he let the men go, he radioed ahead to other officers and indicated he had a "hunch" that he had missed something in his search. Another officer pulled up beside the truck and began to "stare" at the occupants. He eventually pulled over the truck and asked for the occupants' social security numbers. He ordered a drug dog which was brought to the scene. He then ordered the defendant to take out his wallet and look for his social security card, even though the defendant had said he did not have it with him. The officer stated that when the defendant took his wallet out, the officer could see "the corner of what appeared to be a counterfeit Social Security

31

card". The defendant was eventually arrested for being in the United States illegally and made an incriminating statement.

The court held that the incriminating statement should be suppressed because "Agent Ochoa's conduct bordered on harassment. Acting solely on an unsupported, inarticulable 'hunch' supplied by another officer, after the suspects have already been exonerated by a previous investigation, is flagrant misconduct under the Fourth Amendment." Id. at 1523.

In this case, there was no purposeful or flagrant conduct on the part of the officers. They were mistaken in their belief that probable cause existed to arrest defendant before he took any real action to remove the marijuana from the generator. In fact, if they had waited just a few moments, it is possible that defendant would have gone to the truck and used his drill to open the crate and to open the generator to retrieve the drugs. Prior to asking for consent to search the residence, the detective advised defendant of his Miranda rights and made sure he understood those rights. He told defendant that he did not have to consent to a search and that if he did not consent, the police could not search his house. He read a consent-to-search form to defendant and had him read it as well, and the form advised defendant that he had a constitutional right to refuse to consent to a search. Finally, the detective advised the defendant that he would be searching for evidence of a drug crime.

32

Before defendant gave his statement, he was again advised of his _Miranda_ rights and he signed a _Miranda_ waiver form. The uncontroverted evidence is that defendant was very cooperative and that he wanted to cooperate with the police.

This goes above and beyond any of the circumstances described above wherein the courts have held that the evidence should not be suppressed. This factor, the most important of the analysis, weighs heavily in favor of a finding that the taint of the unlawful arrest was sufficiently purged and that the evidence seized during the searches and the statements made by defendant should not be suppressed.

## VII. CONCLUSION

Based on the above-stated findings of fact and the law as discussed in sections III. through VI., I conclude that defendant voluntarily consented to a search of his residence, the search was within the scope of his consent, he voluntarily waived his _Miranda_ rights and made a voluntary statement, and there was no probable cause for his arrest but that the taint of the unlawful arrest was sufficiently purged and neither the evidence seized as a result of the voluntary consent nor defendant's voluntary statement should be suppressed as fruits of the unlawful arrest. Therefore, it is

RECOMMENDED that the court, after making an independent review of the record and the applicable law, enter an order

33

denying defendant's motion to suppress evidence and statements.

Counsel are advised that, pursuant to 28 U.S.C. § 636(b)(1), each has ten days from the date of this report and recommendation to file and serve specific objections.


                                    _/s/ Robert E. Larsen_____
                                    ROBERT E. LARSEN
                                    United States Magistrate Judge

Kansas City, Missouri
April 17, 2008